All right. Our third case is number 24-10797, Byron Chemaly. I hope I'm pronouncing his last name correctly, or Chemaly, versus Eddie Lampert et al. Mr. Parrish. Thank you, Your Honor. May it please the Court, Counsel, my name is Philip Parrish and I represent the Appellant Cross Appellee. According to my trial lawyer, it's Chemaly. Chemaly, okay. Byron Chemaly. I'd like to begin this oral argument by inviting this Court to assume that the U.S. Supreme Court's decision in GE Energy v. Atacompo and Morgan v. Sundance and this Court's decision, subsequent decision in Corporation AIC v. Hydroelectrica, instead of being decided in 2020 and 2022, had been decided in the year 2000. In that instance, would this Court's opinion in Bautista and the Fifth Circuit's decision in Stolt, two years earlier, have been decided the same way? And our position is that it would not have. And we say that for three reasons, starting from the most general and overarching, almost all of the cases dealing with the Convention, particularly with respect to Siemens contracts and maritime law, have approached the issue from a decidedly pro-arbitration policy, what I would refer to as putting a thumb on the scale for arbitration. That was certainly the situation in Bautista, which said we have three issues in this case, we're going to look at all of them through that lens. Now, in GE Energy and in Morgan v. Sundance, as well as the Saxon case, all fairly recent U.S. Supreme Court decisions, the Court has said, wait a minute, the lower courts, the courts of appeal and district courts have been taking what we've said previously about arbitration way out of context. In the Morgan case, the Supreme Court overruled nine circuits who had developed a specific rule, which they referred to as a bespoke rule for arbitration, that changed the law on how you analyze whether someone has litigated too far and therefore waived their right to arbitration. The Court said, if applying the correct rule means that an otherwise arbitrable case doesn't get arbitrated, so be it. Secondly, and this Court, sitting on BAC in Hydroelectrica, picked up on this from the GE case, it said, these cases, there were two specific cases that this Court overruled in Hydroelectrica, it said, they began from a faulty premise, and that faulty premise language comes directly from the GE v. Atacampo case, the premise that the convention displaces domestic law. Third, and most specifically to Bautista, the United States Supreme Court held in GE Energy that the null and void, or inoperable, or incapable of arbitration defense, I actually don't look at it as so much of a defense as a condition preceding to ordering an arbitration, but that that has a gap. It's not specified what it means. Let me ask you a question about this, Mr. Parrish. You might be making a pretty good argument why we ought to go in BAC with Bautista, but what you've got to establish before this three-judge panel is that the Supreme Court law you're talking about, like GE Energy v. Atacampo, not only undermines some of the rationale, but it really abrogates Bautista. And the trouble that I have with the argument is it doesn't strike me as being on all fours and I don't think it guts the holding in Bautista. I think it puts the reasoning in considerable tension with the Supreme Court's later ruling. But unless it, our language is the intervening Supreme Court case must actually abrogate but directly conflict with as opposed to merely weakening the holding of the prior panel. And I don't think you can say that that Supreme Court opinion overruled Bautista since it didn't consider whether the null and void provision of Article 2, Subsection 3 embraced the Jones Act or the semen exception of the FAA. Indeed, it didn't even interpret the phrase at all, stating only that the phrase is undefined. And so it seems to me what you can say, and I think you've said it, and I think you've directed any per se rule against applying domestic law under the convention. But that doesn't mean that Article 2, Section 3 must be read in the way Shomali would have us read it. So I think the argument you're making is probably better directed to an en banc court than a three-judge panel, which is bound by our prior law. So I guess what I'm asking is, does that Supreme Court case really gut, abrogate what we said in Bautista? Or is it just more likely to say it's in some tension with it? So I think that, first of all, your points are, as always, very well taken. But I think what the language is, and I cite U.S. v. Archer in the brief, that if the court's precedent in Bautista has been undermined to the point of abrogation, you're bound to follow the new rule of law. Obviously, GE didn't deal with-  So if you have a holding here, and there are three props upon which the holding rests, and the Supreme Court, in another case that doesn't answer the direct question, but obliterates each of the three props, leaving nothing but a hollow shell, that's an abrogation. The problem that I have is I don't think the Supreme Court knocked all the props out in that case because it was factually, procedurally, and textually different. Am I missing that? Well, so there are two arguments here for why we think Bautista's wrong. One is based on the language of Section 1, Section of the FAA, Chapter 1, as it applies to Section 202 of the Convention. That's the statutory interpretation argument and ruling from Bautista. There was a second ruling in Bautista which addressed this specifically, the null and void, what is referred to as a defense, but again, I think it's really a threshold issue as to whether the arbitration agreement is null and void. The Supreme Court did specifically say that that provision should be interpreted not as Bautista did. It didn't reference Bautista, of course. Let's look at what Bautista said about the quote-unquote defense that the POEA contracts for the Filipino seaman in Bautista, you know, didn't violate or were not null and void. The Court says, and this is at page 1302, while it is plausible that economic hardship might make a prospective Filipino seaman susceptible to a hard bargain during the hiring process, plaintiffs have not explained how this makes for a defense under the Convention. It is doubtful that there exists a precise universal definition of the unequal bargaining power defense that may be applied effectively across the range of countries that are parties to the Convention, and absent any indication to the contrary, we decline to formulate one. So Bautista was saying the only way to apply the null and void defense is to look outward for some universal definition of unequal bargaining power rather than looking, as GE says we must, and as this Court said in Hydroelectrica en banc, we don't start from the faulty premise that the Convention covers everything, and unless it's explicitly included, it's excluded. What domestic law do we look to? So there's, in this case, when you have a maritime contract, you look to maritime law. Now in Sundance, when the Supreme Court said we don't have bespoke rules for arbitration, you know what this country does have bespoke rules for? For maritime law, for admiralty. We have statutes and we have common law decisions that make seamen essentially wards of the court, they're treated as young heirs, as it says in the Garrett v. Moore McCormick case that we cited in our brief. We have now a hundred years' history of the Jones Act, which incorporated FILA, and not coincidentally, those are the two specific types of workers mentioned in Section 1 of the— Does that mean that every single maritime contract involving a seaman is based on unequal bargaining power and gets thrown out the window? Well, yeah, I suppose that might come down to the facts of the case, but our— Well, the unequal bargaining power, if you're relying on the status of seamen, the favored status of seamen generally in maritime law, that unequal bargaining power would play out the same way in every single case. Right. Well, I mean, so for instance, in Bautista, the court referred to the fact that there was a, quote-unquote, collective bargaining agreement. We have no such—this is not one member of a cruise line. This is a single individual who was hired by basically a private owner-operator of a pleasure yacht, a very large pleasure yacht. And the only thing in the record right now, there's nothing from defendants in the record like there was in Bautista that said, oh, everything was explained to these people. There's nothing from the defendants about that. The plaintiff's affidavit, DE 15-1c, says at paragraph 11 that basically I was not given an opportunity to read this, and I was not given an opportunity to negotiate. We know from Garrett versus Moore that the burden is actually in maritime cases placed upon the employer to establish that there was a knowing waiver of rights. That happened to be a release, and quite frankly, given what happens when there's an arbitration under foreign law in a foreign place, you might as well have released your rights by signing an appointment agreement that contains an arbitration agreement because you're never going to get anything remotely approaching Jones Act unseaworthiness and maintenance and cure recovery in a foreign arbitration where they're not applying U.S. law, which, by the way, they were applying in Bautista U.S. law. In Mitsubishi, they were applying U.S. law in Japan during that. That also points out that this case, from an overarching arbitration standpoint, isn't the type that the Supreme Court was talking about in Mitsubishi where we have to make sure that we are fostering American business throughout the world globally. This is a Miami-based hedge fund manager who owns a very large yacht who employed a couple of people on his yacht, including Mr. Shumeli. Can I ask you just two prefatory? The time is really short. You've gone over, and so you're answering my question on our time, not yours. One is a prefatory question, and the other is a more basic one. Prefatory, can we tell what the damages sustained by your client were in this case? Significant. What does that mean? He's had, it tore his rotator cuff. He's had several surgical procedures regarding that shoulder. It has affected his ability to earn wages significantly. Second and more basic. As I review the overall complaint, count one Jones Act negligence against operations found in Head and Lampert. Count two, unseaworthiness against operations found in Head and Lampert. Count three, failure to provide maintenance and cure against operations found in Head and Lampert. Count four, failure to treat. These are all maritime admiralty claims. General maritime, failure to treat against all six defendants. Count five, negligence against camper who managed the yacht. Count six, claim for conversion brought against all of the defendants concerned. The property after Shamali was repatriated to Africa, he didn't get his stuff back. Count seven, breach of contract, that's brought only against the insurance companies. Camper and yacht, Kaitlin that insured the yacht. Those are the seven claims that you have here. The district court remanded to state court under 1447D counts two, five, six, and seven. Count four as to the defendants Gold, Camper, and Kaitlin. And compelled arbitration with regard to operations in count one, three, and four, but not as to Fountainhead. Where do you think this case belongs? The reason I ask is it strikes me that by your lights, if this court were to do what you want it done in the case on the appeal, and you've got a piece of the case before an arbitrator in the Cayman Islands, you've got a big chunk of the case in Dade County Circuit Court on a 1447D remand, and maybe something still of the remaining stuff in the district court. Do you want this case litigated in three, four? No, Your Honor. Where does this case belong as you see it? Well, I believe that it was improvidently removed, so it should all be in state court. And if I may disagree with you, I think a smaller portion of it was sent back to state court and a larger portion of it was ordered to arbitration. That's the only point that I would disagree with you on. And I think it all ought to be in one place, and if our argument is correct, and before I sit down, I don't want to waive the statutory interpretation argument as opposed to the null and void argument. I'll try to address that if the court has questions about it in my rebuttal. You don't have time to get to everything, so everything you've put in your brief is certainly preserved, and we'll look at every issue for you and for those on the other side of the case, too. I understand you will. Thank you. Let me put the question. I have one more. One more question. If I could finish.  Assume, for the purposes of my question, we were to agree with the district court, at least insofar as she says the C could be enforced against Shomali in arbitration, at least with regard to the signatory operations. Let's hold the other two aside for a moment. Assume we would say that. At least that portion of the case would go to the Cayman Islands in arbitration. So even if we agreed with you that Fountainhead and Lambert were not signatories and she had the district court had misapprehended the doctrine of equitable estoppel and had not properly applied it there, that would not go. So you'd have just with regard to the Jones Act negligent claim, you would have one piece of the case operations before an arbitrator and another piece of the case, Fountainhead and Lambert, either in the district court or on remand to Dade Circuit Court. But in either eventuality, two different fora would be deciding the same claim under the Jones Act involving the different defendants in the case. Doesn't that risk crazy, inconsistent results? I guess what I'm just thinking, looking at the totality of the case, and I'm just speaking for myself here, it struck me that the district court was right about operations. Operations was the signatory and I think she properly enforced the arbitrable provision against operations, let's say, on the Jones Act negligence claim. But she made a mistake on equitable estoppel. I think the doctrine was she took it too far and I think you're right about that. But think of the net result of what I'm saying if that's really right and that's what we do. You'd have a piece before the arbitrator and a piece before either an Article III court or the Dade County Circuit Court. Doesn't that risk profoundly getting a different result on the same claim involving three different defendants? It could, but I'll give you a practical answer from the standpoint of someone who practices plaintiff's personal injury law. Every plaintiff wants to be before a jury rather than an arbitrator. They want to be, so if it were to turn out, and we don't think this is the way it should turn out, but if it were to turn out that it's broken up, you know, there are differences to the cause of action. They're all, not all, even the Jones Act. No, no, I'm just talking about Jones. I would just use Jones Act as an example. I think the problem that I cite obtains with some of the other claims as well. But if I were right, that the district court should be affirmed insofar as she ordered arbitration regarding a signatory to the C Agreement operations, but she were otherwise wrong about Fountainhead and Lampert because she misapprehended or applied equitable doctrine too broadly. She went too far on that. Part of the Jones Act case against one defendant is often the Cayman Islands handled by an arbitrator and Fountainhead and Lampert would be, as you say, before a jury, whether in Dade Circuit Court or in the district court. Isn't there a risk of profoundly different results? Or your answer may be, that may be. We're happy to live with it. So be it. We think there's always a difference between, there's always going to be a profound difference between a result in arbitration and a result in court. No, no, no. But it's on the very same claim. Right. But against different defendants. Against different defendants. We could elect not to pursue the arbitration if we feel like we have a strong enough claim in state court. I mean, there are many things that could happen, the case could settle because of that. So I think my best response is, let the chips fall where they may if that's the case. And you know, if we have... about it. Again, talking about Jones Act negligence. If the district court had made a mistake on equitable estoppel regarding Fountainhead and Lampert, and therefore she could not compel arbitration as to those two, where then would that case go with regard to Jones Act concerning those two defendants? Would that be heard in the district court, pursuant to its admiralty and admiralty jurisdiction, or would that go back to the state court, or would that be up to the district court judge to decide? I think it should go back to the state court because the only, well... But that'd be a decision, wouldn't that be a decision the district court would have to make at a later stage? If you're asking me, under that scenario, we assume that this court rules that the removal was proper because at least a portion of it was in the convention. It's possible... Right, correct, at least as to the signatory to the C agreement. It's possible that there could be a basis for a partial remand for reconsideration of that. The question I want to ask you is, plays off of Judge Marcus's. Was the district court wrong to remand all of the claims that it remanded? Some of them not only had the Federal Arbitration Act and the convention as bases to remove, there was also federal question jurisdiction based on maritime law. For example, the unseaworthiness claim. Unseaworthiness is a maritime claim. There's subject matter federal question jurisdiction as to that claim. Why does that claim get remanded even if you don't go to arbitration? I believe the district court did so. I don't think she was wrong in doing so, I think she did so because the only reason they could file a notice of removal, because we know from Lewis v. Lewis and Clark you cannot remove a Jones Act claim, is that there were, is that there were, is if the convention applies. You had things other than Jones Act claims, you had unseaworthiness, that's a maritime claim. They can't remove a single cause of claim in a lawsuit. No, but you don't remove that, you remove, when you remove a case, you remove a case sometimes based on a single claim that gives rise to federal jurisdiction. Think of a 1983 civil rights lawsuit where there's one federal civil rights claim and there are ten state law claims. You remove based on the one, what happens to the others, we'll see, but here you have at least one maritime substantive claim aside from Jones Act. You've got unseaworthiness, you've got maintenance and cure. We may not be able to reach those issues because of our recent decision in lieu, but I'm not sure the district court should have remanded regardless of what it did on the arbitration point. Well, you know, again, under Woo, that, you know, it's not appealable unless it's even, so long as it was, it was based on subject matter, which it was, it's not reviewable. I haven't really, because it wasn't an issue that, that they raised or that we raised or the district court. Yeah, that's what I was trying to help you with that, but I'm not sure I have an answer. Yeah, that's what I was concerned about while you all litigated in the district court was no arbitration sends it all back, I mean, so you didn't ask, nobody asked, let's keep some of it in the district court, let's go some out to arbitration, let's go some back here. Right. Both sides swung for the fence. Yeah, they did, and so there was no assertion of federal question jurisdiction. There was no request to the district court to do, keep anything, even though it might have had the power to do so, there was no request by anybody in any shape or form because you wanted state court and they wanted full arbitration. Now when I said, is that correct? I believe so. When I said both sides swung for the fence, there may have been an argument that, that they had, that the court had jurisdiction from the defendants under admiralty law as well, but they were seeking to compel everything to arbitration. I don't think they said if you don't compel arbitration, then keep a lot of this case in the federal court. I agree. I don't think they did either. I don't think that was, Judge Blum did a real, I mean, she had a complicated case.  She did a real good thing. I think she would have addressed that if that had been raised perhaps. Can I just follow up one more moment on the question that Judge Jordan asked you? If the district court improvidently remanded based upon a misapprehension of subject matter jurisdiction, is that reviewable by an appellate court or is it your view that we don't have jurisdiction to entertain that at all? As I read Wu and the standards have conceded that it applies, I just think it's wrongly decided, even if it wasn't the correct jurisdictional determination, if it was made on the basis of jurisdiction, it seemed to have been, then you don't have jurisdiction.  So your position is that even if the trial judge made a mistake on remand because she misapprehended subject matter jurisdiction, for our purposes it doesn't matter because we don't have the power to entertain it. That's not the very limited sphere of stuff we can look at, right? That's my understanding of Wu, yes, Your Honor. All right, thank you very much. May I please the court? Good morning, Your Honor. Good morning, Your Honors. My name is Charles DeVant, and I, on behalf, along with my colleague, Aaron Demasiewicz, who represent the appellees in this matter, Your Honors, must absolutely affirm those portions of Judge Bloom's order, which compelled Mr. Shumale to arbitration for those claims arising from Jones Act negligence, maintenance and cure, and the failure to treat claims against our operations, Fountainhead, and Eddie Lampert. In doing so, we also concede, as Judge Marcus touched upon, that this court is without jurisdiction to hear those claims that were remanded to state court. You agree that even if the district court got it wrong and remanded something for lack of subject matter jurisdiction, when there really was subject matter jurisdiction, we can't review that. We have to dismiss that for lack of appellate jurisdiction. Under 1447, we believe that Wu was wrongly decided because in a case where a court— Doesn't matter whether you think it's right or wrong. Doesn't matter whether I think it's right or wrong. I'm bound by it. Yes, Your Honor. Do you agree we have no power as an appellate court to review the 1447 remand that Judge Bloom made to the court, the state court? That's correct, but what we would assert and what we've tried to preserve is that you do have the power to review the order denying arbitration, which is what we were arguing in our briefs. Okay, so help me specifically with regard to that. With respect to— I don't understand. I don't know. Before Judge Marcus gets to his question, I don't understand that. If we can't review the remand order, those claims are gone. So— How can we review those claims? So in the Supreme Court's case, I believe it's cited in our briefs, of course, but in City of Waco, the court there held that it could review an order dismissing a cross-action that was accompanied with an order to remand because, of course, just to put it in context of Judge Bloom's order, her decision to deny arbitration for those claims that she remanded had to logically precede her order to remand because once she decided that the court—once the court decided that it was not going to compel arbitration for those claims, it then loses jurisdiction, arguably, because the removal was made under 205 because she found that those claims didn't fall under the United Nations Convention on Foreign Arbitral Rewards. I understand the sequencing of the argument, but it makes no sense because if you're saying that Wu sweeps broadly to hold that any dismissal and remand of a claim for lack of subject matter jurisdiction is not reviewable on appeal, we can't figure out whether or not the basis for remand was right or wrong. I would agree. I'm just telling—I'm just presenting the argument of why we think it was wrongly decided. So I'll leave that where it's at because— So you agree that we cannot review the district court's rulings on the claims that were not sent to arbitration? Pursuant to the holding of Wu, correct, and it would violate this— I know. You think it's wrongly decided, but you think—you understand that we're bound by it as a later panel. Right. And because of the prior panel precedent rule, just like— Just so that I am clear— Yes, Your Honor. Because you've got a lot of claims, some of which are remanded, some of which go to arbitration, and some may be in the third bucket. With regard to the claims the district judge ordered remanded to state court where she did it on the basis of her view of subject matter jurisdiction, let's just say, and I think she did at least in some measure. That is not reviewable by this panel at this time given controlling precedent in Wu and in 1447D. Do I have that right? Yes, Your Honor. So you agree with Mr. Parrish about that? I do, Your Honor, and we conceded that in our briefing. Okay. Tell me about why the district judge was right to order arbitration against Fountainhead and Lampert. Let's start, say, with the Jones Act. Concededly, they were not signatories, so the only way to do it was to use the theory of equitable estoppel. Tell me why she got that right as you see it. Which theory was ironically the theory that GE Energy versus Otokumpo, the Supreme Court in 2020, specifically said was applicable and could be used as a gap filler in convention cases. The reasoning, Judge Marcus, is because a nonsignatory can compel arbitration when it either has to rely on terms of a written agreement or when the plaintiff alleges substantially interdependent and concerted misconduct against both the signatories and nonsignatories. I take it you're going off on the second ground. Yes, Your Honor. I'm sorry about the first, but let's read the entirety of what the second ground is. When the plaintiff's signatory alleges substantially interdependent and concerted misconduct by the signatories and nonsignatories and, it's put in the conjunctive, and such alleged misconduct is founded in or intimately connected with the obligations of the underlying agreement. As I understand the argument your colleague makes, it is that those claims, let's say Jones Act, unseaworthiness, failure to provide maintenance and cure, are not derived from the C agreement. Those obligations and those claims are imposed by extrinsic legal principles found elsewhere on maintenance and cure, negligence, unseaworthiness, et cetera, and that therefore you can't show that such alleged misconduct is founded in or intimately connected with the obligations of the underlying agreement. It wasn't the underlying agreement that imposed the Jones Act obligation on your clients. It wasn't the agreement that imposed an obligation regarding unseaworthiness or failure to provide maintenance and cure and so on. Those obligations are derived from a different source, from the laws, federal law dealing with those things. If that's true, how can you show that the misconduct was founded in or intimately connected with the obligations of the underlying agreement? Your Honor, so the obligation to provide Jones Act, excuse me, let's just start with maintenance and cure, is derived from the employer-employment relationship and from the vessel-owner relationship, and that obligation and that employment relationship doesn't exist outside of the CFARES employment contract. Byron Shemley wouldn't have been employed as a crew member on this vessel if it not were for the CFARES employment contract. So those claims arise directly out of the employment relationship and are governed by the contract. The complaint that Mr. Shemley filed is mixed, and I think Judge Bloom said that they are one and the same and that they're practically indistinguishable. There are no separate claims against Jones Act negligence, against our operations on the one hand, and then a separate count against Fountainhead, and yet a third separate count against Mr. Lampert. They're all the same. It's the defendants, paragraph 38, as owners and operators of the vessel and employer of the plaintiff. That's the claim that he's making. Judge Bloom certainly got it right with respect to our operations as a signatory and has compelled Mr. Shemley to arbitrate those claims in terms of the Jones Act and maintenance and cure and failure to treat claims. But those same claims that she has properly compelled for our operations are made in the exact same way, with the exact same language, in the exact same paragraphs against Fountainhead and against our operations. Excuse me. But that sounds like a – maybe I'm wrong in the way I'm interpreting your response. That sounds a lot like saying as long as you have common claims against signatories and non-signatories, equitable estoppel will compel arbitration in favor of the non-signatories. Well, it's not necessarily every time, but this certainly is a – You didn't have any qualifiers in your response. I'm trying to find – we have to write an opinion in this case, and even if we agree with you, we've got to figure out what language to use to put sort of limits on when equitable estoppel applies or doesn't apply. And when I read your brief, I didn't see any limits. You seemed to say same claim, same nucleus of operative facts, the non-signatories get swept in under equitable estoppel. That's very broad, it seems to me. Well, it's just encompassing the claims, and our briefing was only dealing with the claims that Mr. Shomali made. I know, but tell me why the principle would apply differently to a different plaintiff who has common claims against signatories and non-signatories. Where are the guardrails? Well, I think if you had, for example, some sort of third party, perhaps a crew member that acted independently to commit a crime that doesn't arise out of the CFER's employment contract, and he made some of those claims against that defendant, certainly those claims wouldn't be subject to arbitration, and those claims aren't significantly or sufficiently intertwined with the claims against the signatory to use the doctrine of equitable estoppel to compel arbitration against the non-signatories. He argues in part that he's trying to sue some of your clients, not all of them, on some of the claims, not all of them, under the borrowed servant doctrine. So tell me how that plays into this or doesn't have any role to play in this. Well, it actually almost makes our argument for us because you have allegations of the borrowed servant doctrine, meaning that Mr. Shomali was – we borrowed a servant from our operations, right? That would be Fountainhead or Mr. Lampert. And so those are intertwined claims. I think in addition to equitable estoppel, you also have other principles that this court has recognized that can be used as domestic law gap fillers to allow a non-signatory to enforce an arbitration agreement, such as alter egos or third party beneficiaries, and I know that that has been fully briefed. But the domestic law that Mr. Shomali urges this court to try and supplant the arbitration provisions is, make no mistake, Section 1 of the Federal Arbitration Act. That is the only U.S. law that I am aware of, and I don't know if Mr. Parrish has any other citations, that does not allow a crew member to arbitrate a claim. And that Section 1, unfortunately for Mr. Shomali, has been held to be in direct conflict with Chapter 2's convention under this court's holding in Batista, under Judge Hull's opinions in Escobar and in Lindo, and of course the 2nd, 3rd, 4th, 5th, and 9th Circuit have all uniformly held that when CFER's employment agreements fall under the United Nations Convention, they can absolutely be compelled to arbitration because this court must do that. So for those reasons, we would ask this court to affirm Judge Bloom's holding that those claims could be compelled. Do you mean the New York Convention, not the United States Convention? The United Nations Convention on Arbitral Awards, on Foreign Arbitral Awards, the one that has been codified in Chapter 2 of Title IX. The New York, so-called the New York Convention, right? Correct. Okay. Referring to a different, I just wanted to make sure we were on the same wavelength. Yeah. Got it. I may be wrong about this, but I thought there were some allegations, in even the complaint, the briefing, that these were the monies with Mr. Lambert. These are just paper companies, and it was kind of like they're all one and the same. But maybe that's not something that's been alleged. I think that all of the complaint co-mingles in some respects. I know Judge Marcus cited some of the counts of the complaint. I'm just talking about the Jones Act claim. Okay. Okay. That's against the operations fountainhead in Lambert that was compelled to arbitration. I thought part of why Judge Bloom did it is they were really paper companies, and Lambert was operating them, and they were all kind of one and the same. Right. But maybe I'm wrong about that. No, that's what the complaint alleges, that the defendants, as owners and operator of the vessel, this is Paragraph 38, an employer of the plaintiff owed the plaintiff a duty to use due care. Was the title to the vessel in the operations company or in the fountainhead? I believe it's in our operations. Okay. That's the signatory to the agreement. Correct, Your Honor. Here's the thing that was puzzling to me. You could have written an employment agreement that said, even though they weren't signatory to the employment agreement, that any claims against operations and its related entities and its owner, Mr. Lambert, will go to arbitration. I mean, that's something really simple that could have been in the employment contract. And shouldn't we consider that? Your Honor, it could have been. I think that's exactly why when Judge Bloom was sitting by designation on the Eleventh Circuit, when Odukumpo was remanded, I think two of the three jurists in that case found that the non-signatories were included within the definition of the signatory in that contract. But in this contract— We don't have that. Correct, Your Honor. All right. Counsel, let me ask you a question that Mr. Parrish began with in his presentation. The bulk of his argument was directed to Batista, and he suggested that Batista is no longer good law and it doesn't control us, that the Supreme Court opinion, which he cited, has utterly eviscerated that holding. Do you agree with that? Absolutely not. Tell me why. There's nothing in GE Energy v. Odukumpo that undermines in any way the Batista holding, this Court's holdings in Lindo or Escobar or Doe, for that matter, or five other circuits. The GE Energy v. Odukumpo case was trying to resolve a circuit split between, I think, the Eleventh and Ninth and the First and the Fourth as to whether domestic law doctrines like equitable estoppel could be used as gap fillers in the convention, and it absolutely said it could. It also was trying to wrestle with whether the convention required certain parties to sign the actual agreement. GE Energy was not a maritime case. It didn't deal with the conflicts that Batista dealt with between Section 1 of the FAA and Chapter 2, the convention, the New York convention. I know it's been called a lot of different things. So we don't see how GE Energy's statement that certainly arbitration or contracts with arbitration agreements shouldn't be placed on a pedestal above other contracts changes or undermines in any way this Court's prior holdings. And to do so, I think, obviously, I think, Judge Marcus, you mentioned it earlier, you'd have to sit in banque to do that. You would invite a massive circuit split, and you would violate this panel's prior precedent rule. So we would ask this Court to— So we're bound by Batista? Absolutely, Your Honor. Last question, at least from me. The duties that the plaintiff claims were breached here by the defendants, which are Jones Act, negligence, et cetera, et cetera, et cetera, weren't they rooted in the Jones Act itself, general principles of negligence, maritime theories, wholly distinct from and apart from the terms of the agreement? Isn't that really the source of those obligations? We don't see— And therefore, the claim of applicable, of equitable stop was just going too far and really ripping it from its moorings to extend it here when the agreement itself is not the source of those obligations? It's not necessarily—we're not going under Part I, as you mentioned. Yeah, but I'm talking about under Part II, the and portion, the last provision I had read. Yes, Judge. I think you're talking about that alleged misconduct is founded in or intimately connected with the obligations of the underlying agreement. Correct. And I'm just asking the question whether these claims are founded in, drawn from, given sustenance by these general laws, Jones Act, maintenance and cure, unseaworthiness, and the like. They don't find their life in the Sea Agreement itself, but rather in these extrinsic bodies of law. That's what he says.  Why is that wrong? Because we submit that those claims don't exist if the Seafarer's Employment Agreement doesn't exist because then there's no employment relationship that would give rise to the Jones Act claim or the maintenance and cure claim or the failure-to-treat claim. We take no quarrel with Mr. Parrish's briefing that certainly this court has for centuries treated seafarers and seamen as wards of the Admiralty Court. We recognize that fully. The Jones Act codified some of those rights, and it was long overdue when it was passed. But that still doesn't undermine what Judge Bloom's holding was, which was that the claims that are being made against our operations on the one hand are sufficiently intertwined and dependent upon the claims made against Fountainhead and Eddie Lampert. Thank you very much. Thank you, Your Honors. Thank you.  Can I ask you, Mr. Parrish, to begin where your colleague stopped in response to the question that I asked? I'm still talking about equitable estoppel here. He says, to use sort of a baseball metaphor or example, you can't say that these claims, the ones we were talking about, are driven simply by general principles of the law found in the Jones Act, general negligence, maritime theories, et cetera. You can't get to first base without the seamen's agreement, and so therefore they are inextricably intertwined. What do you say about that? In which case he says Judge Bloom's determination about equitable estoppel was correct, and those claims against the other two, Fountainhead and Lampert, were properly sent to arbitration. So the rights under the Jones Act are created by statute. The Jones Act does not require that there be a written contract. Now, obviously in today's world, perhaps unlike a couple hundred years ago, where there might have just been a handshake, there's going to be a contract. But the rights arise out of the status of the seamen. I mean there's all kinds of case law. We have the series of cases where what do you do with amphibious employers who are sometimes on land and sometimes at sea, and they're not directly employed by a ship owner, but they go on the ship to paint it or whatever, and you still have to decide their status as a Jones Act seamen or not. And the unseamerness goes with the vessel. I mean it applies to seamen. So for instance, you cannot undo the Jones Act or undo the rights of maintenance and cure by putting certain things in a contract. Judge Bloom, I think, was wrong to look at some of these in terms of maintenance and cure and say, well, the medical care is covered in the contract. Maintenance and cure is a centuries-old doctrine and avenue of relief for seamen based upon their status, whether they've got a contract or not. In fact, Mr. Shumaley worked on this vessel for several days without a contract. He was there on a temporary basis to see if they were going to hire him permanently, and after three or four days they did. If he had been injured in those three or four days before he signed his contract, well, first of all, he wouldn't have this issue about arbitration at all. But secondly, he still would have all of the rights to bring the causes of action he's brought outside of the existence of the contract. If the contract had expired or was not enforceable for some other reason the day before he got injured, he still has all of these claims. So they're not one and the same with the contract at all. That's too broad, too. In the same way that I think your opponent might be crafting a proposition a little bit too broadly, that's too broad, too. Your position seems to be if I don't need the contract to assert the claim, equitable estoppel does not apply. And that seems to me to be a very broad rule, too. I guess also you would look at whether or not the provisions here were broad enough, as Judge Hull pointed out. If you have co-owners of a vessel, they're 50-50, and only one co-owner signs the employment agreement, does the second one get to join arbitration through equitable estoppel even though it's a non-signatory? On an unseaworthiness claim, let's say? I mean, I would say if they're co-owners of the vessel. Yes, that's my hypothetical. 50-50? Probably would be able to. Right. So tell us why that's different from this case. In particular, I want to go to what Judge Bloom says. I'd like to have an answer to my question. My question is, is the hypothetical Judge Jordan just gave you what we have in this case? I don't think so. Tell me what the difference is. So there's one owner, which is the corporation. We have also pled in the alternative, which is why it's not concerted. We have pled alternatively that Lampert was the real owner, that he was the real employer, and as this Court noted in Usme, when you've got that sort of a theory, you don't have to have a contract at all. But that's not the basis the district court went off on, right? There was no piercing of the corporate veil or anything like that here, alter ego theories. I know there was pled, but that's not what the district court used to spin out the application of equitable estoppel. Do I have that right? I don't believe she did use that, no. Okay, that's all I was asking. And I just want to get back very quickly. Before you do that, I'm looking at the equitable estoppel for non-signatories, page 31 of the order where she outlines some of her rationale, and she quotes from your complaint saying operations in Fountainhead are, quote, paper companies with no employees, no offices in the claimants. All this is quoting Lambert, who controlled all aspects of plaintiff's work. Operations in Fountainhead, actually, plaintiff alleges Lambert actually pays everything, not operations in Mountainhead, and is a beneficial owner of the real party and interest of the yacht. And she goes further on. The whole thing is about inextricably intertwined, not just the claims, but the entities or Mr. Lambert and his two paper companies are substantially interdependent. All the conduct is intertwined. He's really the signatory. I mean, that was the basis. Whether it's right or wrong, I don't know. But that was part of the basis for her order on equitable estoppel. It's right under that section, correct? That was part of their basis. And that goes back to your original question about the paper issues. That was primarily alleged because there were some personal jurisdiction issues, and the court did find it had personal jurisdiction over Lambert. I'm going to what is the basis for Judge Bloom's order on page 31, under equitable estoppel, all analyzing just the non-signatories. And so she goes through a lot of things you alleged is the basis for why she said it was inextricably, substantially inextricably intertwined as to be practically indistinguishable, those three defendants, as to the ownership, operation, everything about the yacht. I mean, that's just what she said. Did you not allege those things? Is she quoting? I know you said it in the alternative, but did you not allege? Is she misquoting your complaint? The complaint says the defendants were negligent or that the owner was created in an unseaworthy condition, and it kind of lumped them together in terms of defendants. She says you allege all operating expenses were paid by Mr. Lambert. You don't think she's correct about that? Through his corporation are operations and Camper. I mean, the Camper was the one that provisioned the vessel according to the allegations. It says whatever it says. Thank you. Those are, I think, separate actions that they all took. I would ask the Court, when it's reviewing this, to look at Judge Gorsuch's opinion in New Prime v. Olivera. We cited it in the brief, but there's some interesting language in there about how you deal with it is a Chapter 1, not a Chapter 2 case, but about how you can't really read 2 without reading the exemptions in 1. All right. Thank you both very much.